UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
EAST RAMAPO CENTRAL SCHOOL DISTRICT,

                              Plaintiff,

                    - against -

JAMES P. DeLORENZO, in his official capacity as Assistant
Commissioner of Education for the State of New York; JOHN
B. KING, JR. in his official capacity as the Commissioner of
Education for the State of New York; and STATE
EDUCATION DEPARTMENT OF THE UNIVERSITY OF
THE STATE OF NEW YORK,

                              Defendants.
-------------------------------------------------------------------------x

**OPINION AND ORDER**

No. 13-CV-1613 (CS)

Appearances:
David J. Butler
Bingham McCutchen LLP
New York, New York and Washington, District of Columbia

David B. Salmons
Bryan M. Killian
Randall M. Levine
Bingham McCutchen LLP
Washington, District of Columbia
*Counsel for Plaintiff*

Steven L. Banks
Assistant Attorney General
New York, New York
*Counsel for Defendants*

Seibel, J.

       Before the Court is the Motion to Dismiss of Defendants James P. DeLorenzo, John B.

King, Jr., and the State Education Department of the University of the State of New York

("NYSED"), (Doc. 10). For the reasons stated below, Defendants' Motion is GRANTED.

**I. Facts**

For the purposes of Defendants' Motion, I accept as true the facts (but not the conclusions) stated in Plaintiff's Amended Complaint ("AC"), (Doc. 4.)

   A. *The District's Resolution Meeting Process*

Plaintiff East Ramapo Central School District (the "District") is a local educational agency ("LEA") responsible for providing special education services to its students. (AC ¶ 12.) It seeks a declaratory judgment pursuant to 28 U.S.C. § 2201(a) and 42 U.S.C. § 1983 of its rights and obligations under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*. (*Id.* ¶¶ 1, 8.) Pursuant to the IDEA and related regulations, the District's Committee on Special Education ("CSE") prepares, for each student requiring special education, an Individualized Education Plan ("IEP") that recommends a placement where the student can receive services in the least restrictive environment ("LRE"). (*Id.* ¶ 13.) The IDEA permits parents to file a complaint challenging the CSE's placement recommendation, (*id.* ¶ 14 (citing 20 U.S.C. § 1415(b)(6))), and the statute requires the complaining parent and the District to attend a resolution meeting following such a complaint, (*id.* (citing 20 U.S.C. § 1415(f)(1)(B))). If a satisfactory resolution is not reached at that meeting, the parties proceed to an administrative hearing before an Impartial Hearing Officer ("IHO"), 20 U.S.C. § 1415(f)(1)(B)(ii), after which appeal to a State Review Officer and then the federal courts is available, *see id.* §§ 1415(g), (i).

In furtherance of Section 1415(f)(1)(B), the District convened resolution meetings following a parent's complaint regarding a CSE-recommended placement, and designated at least one representative authorized to negotiate a settlement agreement to attend the meeting on the District's behalf – generally either Art Jakubowitz (Director of Special Education) or Dr. Elizabeth Cohen (Office of Special Education Services), both members of the District's CSE.

(*Id.* ¶¶ 18-19, 21-23.)  If the District's representative and the parent identified a satisfactory placement in the District's best interest at the meeting, the parties entered into a Resolution Agreement, which was subject to approval by the Board of Education.  (*Id.* ¶ 24.)

During the 2012-2013 school year, the District's CSE prepared IEPs for 2,131 special education students.  (*Id.* ¶ 25.)  Parents of approximately thirty students appealed the CSE's placement, and the District resolved twenty-one of those appeals with Resolution Agreements. (*Id.* ¶ 26.)  In fourteen of the twenty-one Resolution Agreements, the District and the parents agreed to placements in private institutions, rather than public schools.  (*Id.* ¶ 27.)

B. *NYSED Review*

States receive federal funds under the IDEA, and state educational agencies have supervisory authority over IDEA implementation.  *See* 20 U.S.C. § 1412(a)(11)(A).  In turn, LEAs that wish to receive IDEA funds must demonstrate to the satisfaction of the state agency that their practices with respect to education of students with disabilities meet state and federal standards.  *See* 20 U.S.C. §§ 1412-13.

On July 31, 2012, NYSED's Hudson Valley Regional Office of Special Education Quality Assurance conducted an on-site follow-up monitoring review to determine if the District had corrected noncompliance identified by NYSED in earlier special education monitoring reviews.  (*Id.* Ex. A, at 1.)  On December 19, 2012, in a letter to Dr. Joel Klein (the District's Superintendent), James DeLorenzo (Assistant Commissioner of Education) summarized the findings from NYSED's review of the District's twenty-one Resolution Agreements.  (*See id.* Ex. A.)  The letter concluded that that the District engaged in "patterns and practices . . . inconsistent with both federal and New York State law and regulation governing the education of students," (*id.* Ex. A, at 2), by allowing one District representative unilaterally to determine the

placement for students with disabilities at resolution meetings, which NYSED found was inconsistent with laws requiring the CSE to recommend a placement in the LRE and evidenced a "clear intent and pattern to circumvent IDEA and remove the IEP decision-making process from the CSE," (*id.* Ex. A, at 3).  In particular, NYSED identified a pattern of the District, after parental request and resolution meetings, placing students in out-of-District Yiddish bilingual special education programs even though the students' IEPs did not indicate a need for bilingual services.  (*See id.* Ex A, at 3-4.)  NYSED directed that the District must "immediately cease and desist its practice of routinely allowing one District representative to unilaterally determine the placement for students with disabilities and override CSE LRE placement recommendations." (*Id.* Ex. A, at 4.)

On January 14, 2013, the District responded to DeLorenzo's letter, stating that it had "conducted itself fully in accordance with applicable law . . . with respect to the challenged special education resolution meetings and agreements . . . in a manner that is designed to serve the best interests of the District's students and taxpayers."  (*Id.* Ex. B, at 1.)  The District disputed that it engaged in a "pattern or practice" of failing to implement CSE recommendations, arguing that the twenty-one Resolution Agreements reviewed by NYSED represented less than two percent of the CSE-recommended placements for the 2012-2013 school year.  (*Id.* Ex. B, at 3.)  The District further disagreed with NYSED that the Board of Education (or its authorized designee) lacked the authority to amend a student's IEP to resolve a parental challenge to a CSE placement at a resolution meeting.  (*Id.* Ex. B, at 4.)  Regarding NYSED's directive that the District must cease and desist unilateral changes to CSE-recommended placements at resolution meetings, the District argued that these Resolution Agreements were "bilateral agreements between the District's authorized representatives (who also are members of the CSE), and

parents," (*id.* Ex. B, at 9-10 (emphasis omitted)), and NYSED lacked the authority to override a Board of Education's discretion to resolve parental challenges to CSE recommendations, (*id.* Ex. B, at 10).[1]

DeLorenzo responded to the District on February 6, 2013, stating that NYSED "[wa]s not dissuaded from the position it ha[d] taken" after considering the District's response. (*Id.* Ex. C, at 1.) NYSED found "no evidence that the District conducted resolution meetings, as constituted under the federal law," and thus "the District's process for unilaterally agreeing to alternate placements . . . d[id] not have a basis in federal and State law and regulation." (*Id.* Ex. C, at 2.) NYSED criticized the District's resolution meeting process on several grounds: (1) such meetings are to be convened only upon the filing of a due process complaint ("DPC") by the parent, yet the District was conducting them (a) upon receiving only a letter (not amounting to a DPC) stating that the parent disagreed with the CSE's placement recommendation and requesting a meeting and (b) without concurrently appointing an IHO, as is supposed to occur upon the filing of a DPC; (2) Mr. Jakubowitz and Dr. Cohen were attending the meetings as CSE representatives without having participated in the development of the relevant IEPs and thus did not qualify as "members of the IEP Team who have specific knowledge of" the student's case as required under the IDEA, 20 U.S.C. § 1415(f)(1)(B)(i); (3) the District had conducted twelve resolution meetings in a single day, suggesting individual consideration had not been given and the meetings were *pro forma* exercises designed to change CSE placement recommendations to the parent's preference; and (4) there was no evidence that the practice was available to all parents of District students with disabilities. (*See id.* Ex. C, at 2-3; *id.* Ex. A, at 2-3.) Regarding NYSED's cease and desist directive, it required the District "to comply with federal and State

---

[1] Although the District suggested that it might sue NYSED under Article 78, N.Y. C.P.L.R. § 7801, (*id.* Ex B, at 2, 11), it apparently did not do so.

5

law and regulations when resolving disputes with parents, in consideration of its responsibility to ensure students receive [free appropriate public education] in the LRE." (*Id.* Ex. C, at 3.)

The District filed the instant lawsuit on March 11, 2013 against DeLorenzo, John B. King, Jr. (Commissioner of Education), and NYSED, requesting a declaratory judgment that the IDEA provides the District with broad discretion to fashion mutually agreeable settlements to parental challenges, and specifically permits the District to:

- designate one representative (who is also a member of the CSE) to conduct IEP dispute resolution meetings, so long as the parent does not request the presence of additional District personnel;
- settle IEP disputes by agreeing to a placement that may not be a placement in the LRE but is in the District's best financial interests (even if the placement is different than the CSE-recommended placement); and
- settle parental challenges to CSE placement recommendations by agreeing to a different placement without the CSE's approval. (*Id.* Prayer for Relief ¶¶ 1-5).

The District further requests a declaration that parental consent to a special education placement is a factor the District may consider when determining whether to settle an IEP dispute, and that the IDEA permits the District to negotiate and attempt to settle IEP disputes with parents who express disagreement with the CSE recommendation in writing. (*Id.* Prayer for Relief ¶¶ 6-7.) Defendants now move to dismiss for lack of subject matter jurisdiction.

## II. Legal Standard

"A federal court has subject matter jurisdiction over a cause of action only when it 'has authority to adjudicate the cause' pressed in the complaint." *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008) (quoting *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 425

(2007)), *rev'd en banc on other grounds*, 585 F.3d 559 (2d Cir. 2009).  "Determining the existence of subject matter jurisdiction is a threshold inquiry, and a claim is 'properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.'"  *Id.* (citation omitted) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "When jurisdiction is challenged, the plaintiff bears the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists, and the district court may examine evidence outside of the pleadings to make this determination."  *Id.* (citations and internal quotation marks omitted).  "[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (alteration in original) (citations and internal quotation marks omitted), *aff'd on other grounds*, 130 S. Ct. 2869 (2010).

### III. Discussion

NYSED, DeLorenzo, and King (collectively, "Defendants") argue that the AC should be dismissed as to NYSED because the Eleventh Amendment divests this Court of jurisdiction over a state agency, and as to all Defendants because there is no right of action under the IDEA.  (Ds' Mem. 2.)[2]  The District responds that it may seek declaratory relief under 42 U.S.C. § 1983 because the IDEA provisions governing resolution meetings benefit LEAs like the District, and thus Congress conferred on school districts a judicially enforceable right to settle parental disputes.  (P's Opp. 1.)[3]  The District also asserts that the Defendants' directive to cease and

---

[2] "Ds' Mem." refers to Memorandum of Law in Support of Defendants' Motion to Dismiss the [] Amended Complaint.  (Doc. 11.)

[3] "P's Opp." refers to Plaintiff's Opposition to Motion to Dismiss First Amended Complaint.  (Doc. 23.)

desist making unilateral placement determinations conflicts with the IDEA, and thus the Defendants' actions are preempted under the Supremacy Clause. (*Id.*)

    A. *Eleventh Amendment*

The Eleventh Amendment's guarantee of state sovereign immunity generally deprives federal courts of jurisdiction over lawsuits brought by private parties against state entities regardless of the remedy sought, *see Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751-52, 765-66 (2002); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 58 (1996), and NYSED is an agency of New York State entitled to Eleventh Amendment immunity, *see Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz*, 290 F.3d 476, 480 (2d Cir. 2002) (affirming dismissal of Section 1983 claim against NYSED based on Eleventh Amendment immunity); *United States v. City of Yonkers*, 96 F.3d 600, 619 (2d Cir. 1996) (NYSED entitled to Eleventh Amendment immunity and thus not suable under Section 1983). The District concedes that the Eleventh Amendment bars suit against NYSED, (P's Opp. 2; Ds' Reply Mem. 1),[4] and as the state has not waived its immunity, NYSED is thus dismissed as a defendant.

    B. *Right Enforceable Under Section 1983*

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. While Section 1983 contemplates suits to enforce individual rights under federal statutes as well as the Constitution, *see Maine v. Thiboutot*, 448 U.S. 1, 4 (1980), it "does not provide an avenue for relief every time a state actor violates a federal law," *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113,

---

[4] "Ds' Reply Mem." refers to Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Amended Complaint. (Doc. 27.)

8

119-20 (2005) ("[Section] 1983 permits the enforcement of '*rights*, not the broader or vaguer 'benefits' or 'interests.''" (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (emphasis in original))); *see Blessing v. Freestone*, 520 U.S. 329, 340 (1997) ("[A] plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*.") (emphasis in original).

"[T]o sustain a [Section] 1983 action, the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs," *Abrams*, 544 U.S. at 120, by showing that: (1) "Congress must have intended that the provision in question benefit the plaintiff;" (2) "the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence;" and (3) "the statute . . . unambiguously impose[s] a binding obligation on the States," *Blessing*, 520 U.S. at 340-41 (internal quotation marks omitted). Demonstrating that the statute creates an individually enforceable right, however, only creates a rebuttable presumption that the right is enforceable under Section 1983, which presumption may be defeated by evidence that Congress "specifically foreclosed" this remedy, *Smith v. Robinson*, 468 U.S. 992, 1004 n.9 (1984), *superseded by statute on other grounds as recognized in Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 235 (1995)*,* either "expressly, by forbidding recourse to [Section] 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under [Section] 1983," *Blessing*, 520 U.S. at 341.

Defendants argue that Congress created a narrow private right of action under the IDEA, allowing for lawsuits only regarding matters raised in an administrative due process complaint regarding services for and placement of a child, and thus Congress did not create a right of action allowing school districts or other LEAs to sue a state educational agency. (Ds' Mem. 13 (citing

9

20 U.S.C. § 1415(i)(2)(A)[5].)  It points to decisions of several Circuits so holding.  (*Id.* at 13-14.)  The District responds that Defendants cite no authority considering a right of action under the IDEA in connection with a Section 1983 claim or 20 U.S.C. § 1415(f)(1)(B),[6] the statutory

---

[5] 20 U.S.C. § 1415(i)(2)(A) provides a "[r]ight to bring civil action" for "[a]ny party aggrieved by the findings and decision made under subsection (f) or (k) . . . ."  20 U.S.C. § 1415(i)(2)(A).  Subsection (f) of Section 1415 allows for an "[i]mpartial due process hearing" regarding matters raised in a complaint filed either pursuant to Section 1415(b)(6)(A) ("any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child") or Section 1415(k)(3)(A) (hearing regarding placement in alternative education setting when child violates student code of conduct).  Section (k) generally sets out procedures for placement of and services for students who violate the student code of conduct.

[6] 20 U.S.C. § 1415(f)(1)(B) provides:

(B) Resolution session

    (i) Preliminary meeting

Prior to the opportunity for an impartial due process hearing under subparagraph (A), the local educational agency shall convene a meeting with the parents and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint--

    (I) within 15 days of receiving notice of the parents' complaint;

    (II) which shall include a representative of the agency who has decisionmaking authority on behalf of such agency;

    (III) which may not include an attorney of the local educational agency unless the parent is accompanied by an attorney; and

    (IV) where the parents of the child discuss their complaint, and the facts that form the basis of the complaint, and the local educational agency is provided the opportunity to resolve the complaint,

        unless the parents and the local educational agency agree in writing to waive such meeting, or agree to use the mediation process described in subsection (e).

    (ii) Hearing

If the local educational agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all of the applicable timelines for a due process hearing under this subchapter shall commence.

    (iii) Written settlement agreement

In the case that a resolution is reached to resolve the complaint at a meeting described in clause (i), the parties shall execute a legally binding agreement that is--

    (I) signed by both the parent and a representative of the agency who has the authority to bind such agency; and

    (II) enforceable in any State court of competent jurisdiction or in a district court of the United States.

    (iv) Review period

If the parties execute an agreement pursuant to clause (iii), a party may void such agreement within 3 business days of the agreement's execution.

20 U.S.C. § 1415(f)(1)(B).

provision at issue here.  (P's Opp. 6-7.)  The District further asserts that Section 1415(f)(1)(B) provides it the right to settle claims brought by parents who disagree with a CSE-recommended placement, and because Congress intended this provision to benefit LEAs like the District, Congress thus "unambiguously conferred" on the District a judicially enforceable right to settle these claims.  (*Id.* (quoting *Gonzaga Univ.*, 536 U.S. at 283).)

The District's assertion that "[t]he only reasonable interpretation of Section 1415(f)(1)(B)(i)(IV)" is that it creates "judicially enforceable rights," (Ps' Opp. 8), is unavailing, and I agree with Defendants that that Section creates no rights that the District may enforce either through the IDEA or Section 1983.  First, to the extent that the District's argument suggests that the standard for determining whether a right is enforceable under Section 1983 differs from, or is less stringent than, the test for whether a statute itself creates a private right of action, (P's Opp. 11-12 ("In a Section 1983 case, the only question is whether Congress created a judicially enforceable right. . . . In a case alleging an implied right of action, by contrast, the question whether Congress created a right is only one question of many.")), the Supreme Court has explicitly rejected this assertion, *see Gonzaga Univ.*, 536 U.S. at 283 ("We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under [Section] 1983. . . . This being so, we further reject the notion that our implied right of action cases are separate and distinct from our [Section] 1983 cases."). Indeed, the "court's role in discerning whether personal rights exist in the [Section] 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context," *id.* at 285, because these analyses both ask whether "Congress *intended to create a federal right*," *id.* at 283 (emphasis in original).  "[I]mplied right of action cases should guide the determination of whether a statute confers rights enforceable under [Section] 1983,"

11

and "there is no basis for a private suit" under either theory where the text and structure of the statute lack any indication that Congress intended to create a new right.  *Id.* at 283, 286.

Second, case law holds that the IDEA does not create a private right of action in favor of school districts or other LEAs, and the District's attempt to distinguish these cases is unpersuasive.  The Second Circuit held that an LEA has no right of action to sue a state educational agency under the IDEA, *see Cnty. of Westchester v. New York*, 286 F.3d 150, 153 (2d Cir. 2002) (per curiam) (affirming dismissal of suit against NYSED and refusing to "imply a private cause of action in the absence of clear congressional intent and in the face of an express allocation of enforcement authority" to Secretary of Education), and the Third, Sixth, and Ninth Circuits are in accord, *see Lake Wash. Sch. Dist. No. 414 v. Office of Superintendent of Pub. Instruction*, 634 F.3d 1065, 1068 (9th Cir. 2011) (no private right of action for LEAs "apart from contesting issues raised in the complaint filed by the parents on behalf of their child"); *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627-31 (6th Cir. 2010) (no express or implied right of action for school district to sue state); *Lawrence Twp. Bd. of Educ. v. New Jersey*, 417 F.3d 368, 371-72 (3d Cir. 2005) (same).  While I agree that these cases were brought under different sections of the IDEA and did not specifically analyze Section 1415(f)(1)(B), (*see* P's Opp. 10-11), the courts agreed that the IDEA provides rights only to certain groups – parents and students – and not to school districts, *see Lake Wash. Sch. Dist.*, 634 F.3d at 1068 ("In short, [Section] 1415 establishes a private right of action for disabled children and their parents.  It creates no private right of action for school boards or other local educational agencies . . . ."); *Traverse Bay Area Intermediate Sch. Dist.*, 615 F.3d at 629, 631 (IDEA "designed to benefit disabled children and their parents" and thus LEA may only bring claim involving disabled student's IEP); *Lawrence Twp. Bd. of Educ.*, 417 F.3d at 371 (statutory

language "strongly suggests that Congress intended to provide a private right of action only to disabled children and their parents"); *Cnty. of Westchester*, 286 F.3d at 152 (given that Congress expressly provided right of action for those aggrieved by administrative decision relating to student services, unlikely it intended to create other private rights for LEAs).  This unanimity regarding the lack of a private right of action for LEAs in other IDEA provisions strongly suggests that Section 1415(f)(1)(B) did not create a judicially enforceable right.

Moreover, the reasoning of those cases applies fully to Section 1415(f)(1)(B).  The Second Circuit in *County of Westchester* pointed out that Congress, having "provided a private right of action in favor of certain groups" but "not expressly provid[ing]" the same for others, was "extremely unlikely" to have intended such a remedy.  286 F.3d at 152 (citing *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 20 (1979) ("In view of these express provisions for enforcing the duties imposed . . . , it is highly improbable that Congress absentmindedly forgot to mention an intended private action.") (internal quotation marks omitted)).  It also noted that the IDEA expressly "delegated regulatory and enforcement authority to the Secretary of Education," which is "inconsistent with implying a private right of action because private litigation tends to transfer regulatory interpretation and discretion from the agency to the courts."  *Id.* at 153 (alteration and internal quotation marks omitted).  Defendants provide no reason why the same logic would not apply here.

I further disagree with the District that Section 1415(f)(1)(B) possesses "rights-creating" language indicating Congressional intent to create enforceable rights.  The District argues that Section 1415(f)(1)(B) – requiring a parent and the LEA to attend a resolution meeting in an attempt to settle a parent's complaint – is the only provision in the IDEA creating a right for LEAs (as opposed to parents or students).  (*See* P's Opp. 7-8.)  Because the LEA is "provided the

13

opportunity to resolve the complaint" at the resolution meeting, 20 U.S.C. § 1415(f)(1)(B)(i)(IV), and the LEA must convene the meeting in the first instance, *id.* § 1415(f)(1)(B)(i), the District concludes that "Congress wanted to protect local education agencies' 'opportunity' to settle parental complaints from infringement by outsiders – like overbearing state education agencies," (P's Opp. 8) – as evidenced in part by the term "opportunity" in Section 1415(f)(1)(B)(i)(IV), which the District asserts functions as "rights-creating language," (*id.* at 8-9 (quoting *Gonzaga Univ.*, 536 U.S. at 287) (internal quotation marks omitted).)

The entirety of Section 1415(f)(1)(B)(i), however, describes the procedural requirements of the meeting the LEA "shall convene" with parents following the receipt of a DPC – including the time within which it must be held, the availability of counsel, the mandated attendees, and provisions for waiver. *See* 20 U.S.C. §§ 1415(f)(1)(B)(i)(I)-(IV). Although the District argues that Section 1415(f)(1)(B)'s language regarding the LEA's opportunity to settle with parents evidences an intent to provide judicially enforceable rights to LEAs, that language is part of a larger provision spelling out how the LEA must conduct the meeting, and bears no resemblance to provisions found to create enforceable rights. *See Gonzaga Univ.*, 536 U.S. at 284 & n.3 (Title VI of Civil Rights Act of 1964 and Title IX of Education Amendments of 1972 create rights because phrased with "*unmistakable focus* on benefitted class;" rare to impute to Congress intent to create private right absent "explicit right- or duty-creating language") (internal quotation marks omitted) (emphasis in original). To the extent that Section 1514(f)(1)(B) is "phrased in terms of the persons benefited," *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690 n.13 (1979), it is plain that that person is the student or his/her parent(s). The text focuses exclusively on procedure and the LEA's obligations, and lacks any indication that it creates an "*individual*

entitlement" for the LEA enforceable through Section 1983 or otherwise. *Gonzaga Univ.*, 536 U.S. at 287 (emphasis in original); *cf. Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.") (internal quotation marks omitted).

Finally, the District's arguments that it has a federally protected settlement right due to the IDEA's "cooperative process" and Congress's preference for "encouraging voluntary settlement," (P's Opp. 9-10), are unavailing; those policies provide no basis for a private right "[w]here the text and structure of a statute provide no indication that Congress intend[ed] to create new individual rights," *Gonzaga Univ.*, 536 U.S. at 286. I also agree with Defendants that the District's argument that "opportunity" and "right" are synonyms, and thus Section 1415(f)(1)(B)(i)(IV) confers upon the LEA an enforceable "right to resolve" a parent's complaint, is meritless, and the case the District cites in support of this assertion is inapposite. *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 86-89 (1981) (finding appealable denial of joint motion of parties to enter consent decree). That a court case use the terms interchangeably in a particular context does nothing to show an unambiguous Congressional intent to create a private right of action in a wholly different context.

Thus, the District has failed to satisfy its burden of demonstrating that Congress created a right benefitting it enforceable through Section 1983, and the AC must be dismissed.

   C. *Preemption*

The District asserts that even if Section 1415(f)(1)(B) does not create a judicially enforceable right, Defendants' directive to the District is inconsistent with federal law and thus preempted under the Supremacy Clause of the Constitution. (*See* P's Opp. 12-14.) I disagree.

There is no Supremacy Clause preemption claim in the AC, and for this reason alone, I need not consider this argument because the District may not amend the AC through an opposition to Defendants' Motion.  *See Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (summary order).  Had the District asserted a preemption claim in the AC, however, I would disagree that Section 1415(f)(1)(B) preempts the Defendants' directive to cease and desist making unilateral placement decisions at resolution meetings.

There are several forms of preemption:  when (1) "Congress expressly provides that a federal statute overrides state law;" (2) "Congress legislates so comprehensively in one area as to occupy the field;" or (3) "state law directly conflicts with the structure and purpose of a federal statute."  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96-97 (2d Cir. 2013) (internal quotation marks omitted).  "In all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied," such as education, there exists a presumption against preemption absent "the clear and manifest purpose of Congress."  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (alterations and internal quotation marks omitted).

Because the IDEA lacks a preemption provision and specifically provides a role in special education services to states, *see* 20 U.S.C. § 1412, preemption would exist, if at all, only under a conflict preemption theory.  A conflict has preemptive effect in only two instances – "first, when compliance with both federal and state regulations is a physical impossibility, and second, when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *MTBE*, 725 F.3d at 97 (internal quotation marks omitted).  The District argues that Defendants' directive creates an obstacle by inhibiting its ability to reach settlements during resolution meetings, which is contrary to Congress's goal that "when willing,

16

both sides enter into a mutually agreeable compromise before a due process hearing." (P's Opp. 12.) Under obstacle preemption, "federal law does not preempt state law . . . unless the . . . conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *MTBE*, 725 F.3d at 102 (internal quotation marks omitted). The Defendants' directive to the District to "use the dispute resolution processes established in federal and State law and regulation," rather than to "routinely allow[] one District representative to unilaterally determine the placement for students with disabilities and override CSE LRE placement recommendations," (AC Ex. A, at 4), does not inhibit the District's ability to settle disputes, but rather only the practice of approving unnecessarily restrictive placements by permitting one District representative to "circumvent or overturn CSE decisions" at resolution meetings, (*id.* Ex A, at 3), which Defendants assert is inconsistent with federal and state law and regulations. Even if Defendants are wrong that the District's practices are improper – which this Court does not suggest – their directive does not prevent the District from complying with the IDEA in general or settling disputes in particular. Indeed, it is difficult to see how a state's directive mandating compliance with the IDEA and state regulations could fail to further the "purposes and objectives of Congress" or otherwise create "an obstacle to the[ir] accomplishment," *MTBE*, 725 F.3d at 97, where the state's interpretation of the statute is – as here – at least colorable. That Defendants have directed the District to comply with their reading of Section 1415(f)(1)(B) in fashioning resolutions to parental complaints does not evidence a conflict so "direct and positive," *id.* at 102, as to overcome the presumption against preemption.

    D.  *Motion to Intervene*

        This case was originally assigned to Judge Engelmayer, who transferred it to me on May 23, 2013, (Doc. 24), following a motion filed by non-parties to this action – the plaintiffs in a

matter assigned to me, *see Montesa v. Schwartz*, No. 12-CV-6057 (CS) (S.D.N.Y. filed Aug. 8, 2012)[7] – seeking to intervene and to transfer the case, (Doc. 12). Given the disposition of Defendants' Motion to Dismiss, the *Montesa* plaintiffs' Motion to Intervene is moot.

E. *Leave to Amend*

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The District has not requested leave to file a Second Amended Complaint or suggested that it could cure the deficiencies identified in this Opinion. Granting leave to amend would be futile here where I have dismissed the AC for lack of jurisdiction and a right enforceable under Section 1983 or otherwise, and the District has "not indicated how [it] could satisfy" these requirements through further amendment. *In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 402 (2d Cir. 1994); *accord Ashmore v. Prus*, 510 F. App'x 47, 49 (2d Cir. 2013) (summary order) (no error in denying leave to amend as futile where "the barriers to relief for [plaintiff's] claims cannot be surmounted by reframing the complaint"). Accordingly, I decline to grant the District leave to amend *sua sponte*. *See Shechet v. Doar*, 518 F. App'x 26, 27 (2d Cir. 2013) (summary order) (no error to deny leave to amend where amendment would be futile and plaintiff failed to assert that defects could be cured by

---

[7] The *Montesa* Plaintiffs allege, among other things, that the District is using the IDEA settlement process to provide a publicly-funded Jewish education in private schools to students who could be properly educated in the District's schools. (*See* 12-CV-6057 Doc. 17.)

amendment); *Book v. Tobin*, 263 F. App'x 174, 175 (2d Cir. 2008) (summary order) (no error to deny leave to amend as futile for lack of jurisdiction).

## IV. Conclusion

For the reasons stated above, Defendants' Motion for lack of subject matter jurisdiction is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 10), and close the case.

**SO ORDERED.**

Dated: October 3, 2013
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.